# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | |
|---|---|
| **LEONARD TIMS** | **CIVIL ACTION NO. 16-1704** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **CITY OF MONROE AND JAMES MAYO** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

This is an employment civil rights action filed by Plaintiff Leonard Tims ("Tims") against Defendants City of Monroe ("the City") and James Mayo ("Mayo"). Tims contends that his employment was terminated in violation of his First Amendment and Due Process rights because of his union activity and support for Mayo's opponent for mayor. Defendants contend that Tims was lawfully terminated for insubordination.

Pending before the Court is a Motion for Summary Judgment [Doc. No. 19] filed by Defendants. For the following reasons, the Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I.    FACTS AND PROCEDURAL HISTORY

Tims, who has a bachelor's degree in political science and master's degree in public administration, first worked for the City between 1992 and 1996 as an EEOC compliance officer. In October 2013, he was again hired by the City, at Mayo's request, as the City's Beautification Supervisor. In this capacity, he supervised five crews of three to seven persons who used

equipment, such as bushhogs, large tractors, riding lawnmowers, weed-eaters and chain saws, to cut trees, grass, and bushes on City property and to maintain City rights of way and Interstate land within the City limits.

Tims became a member of the Local 2388 of the American Federation of State, County, and Municipal Employees ("the Union") on May 15, 2014. The Union and City have entered into a collective bargaining agreement ("CBA"), which covers Tims' employment. Shortly after joining the Union, Tims became a member of the Executive Board. Neither Mayo nor any other City official ever told Tims not to join the Union, not to attend Union meetings, not to make statements in Union meetings, not to participate in Union activities, or to quit the Union.

In 2016, Mayo was up for re-election. Tims and the Union supported Mayo's opponent, Dr. Ray Armstrong ("Armstrong"). During the campaign, Tims wore hats and shirts and held signs in support of Armstrong. Mayo and Janway saw Tims on the news and in the newspaper in support of Armstrong. Assistant City Attorney Angie Baldwin ("Baldwin") was also aware of Tims' support of Armstrong and recalled seeing him on Armstrong's Facebook page.

In the fall of 2015, a candidates' forum was held. Both Mayo and Armstrong participated. Tims and other Armstrong supporters were standing in the back of the room. At the podium, Mayo made a comment about the Armstrong supporters. According to his then-challenger, Armstrong, Mayo stated that "I am surprised to see you people here," and, again, according to Armstrong, said to Tims, "especially those that I give jobs to."[1] [Doc. No. 26, Exh.

---

[1] The Union Vice-President, Mike Caster, also recalled Mayo stating that he hired some of the employees and was disappointed, while looking at Tims. [Doc. No. 26, Exh. 11, Caster Depo., p. 57].

8, p. 12]. Tims recalls that he was the only employee there whom Mayo had given a job.[2]

However, neither Mayo nor Janway ever directly threatened Tims, told him not to wear Armstrong shirts or hats, stopped him from donating funds to Armstrong's campaign, or mentioned anything about campaigning at all.

Prior to January 2016, Tims had no disciplinary actions in his personnel file.

On January 22, 2016, Tims failed to punch or clock out of work when he attended a criminal court proceeding against the Union vice-president, Mike Caster ("Caster"), who was charged with assaulting a non-Union member during a meeting. Tims had not been subpoenaed, and the Union was not involved in the proceeding, but Tims considered this Union business. Hopkins issued a written warning to him for his failure to clock out and get permission to attend the proceeding.

On January 26, 2016, Tims donated $1,000.00 to Armstrong's campaign. Tims was the only Union member to donate to the campaign. Hopkins and Janway had a conversation in which Janway stated that Tims had donated to the campaign.

According to Caster, during a televised city council meeting prior to the election, Mayo

---

[2]Defendants contend that Mayo's testimony does not prove that Tims was the only one at the forum hired by Mayo. The Court finds Mayo's deposition to be unclear and certainly not sufficient to override Tims' testimony when viewed in the light most favorable to him. At Mayo's deposition, the following exchange took place:

Q. Okay, so again, the only person you can remember, and correct me if I'm wrong, that you actually helped get hired here that was back there was Mr. Tims, unless you can remember other people?

A. Well, specific, Mr. Tims and this guy. It was Mr. Tims because I've known him for along time, and it's clear to me how–the circumstances in which he came to the City.

[Doc. No. 26-2, Mayo Depo., p. 135].

was engaged in a "heated" discussion over people who received money from Armstrong's campaign and people who donated money to Armstrong's campaign. Again, according to Caster, Mayo mentioned Tims as a person who donated to Armstrong's campaign.

Mayo was re-elected as Mayor in March 2016.

That same month, Janway chastised Tims for failing to notify a landowner before removing an old, large oak from the City's right-of-way. Tims was not written up or otherwise disciplined for the incident. Around this same time, Janway advised Tims that his crews should complete cutting and removal of trees damaged by tornado activity by July of 2016, which Tims believed to be an unreasonable period of time for the completion.

On Friday, April 22, 2016, a sanitation worker, McArther Hunter ("Hunter") was operating a tractor when it fell over a four foot wall embankment. Hunter was not hurt, but was shaken up. Tims informed his direct supervisor, Sanitation Superintendent Don Hopkins ("Hopkins"), of the accident. Hopkins directed Tims to take Hunter to St. Francis Community Health Center/Occupational Medicine Clinic ("Occumed"), which is about 1 ½-2 miles from the accident site, for a drug test. The City's Substance Abuse Testing Policy requires a drug test when an employee has an on-the-job accident and the property damage is estimated at more than $5000. Similarly, for purposes of workers' compensation, if an employee suffers a work-related incident, accident, or injury, he is required under City policy to have a "post-accident drug screen immediately (even if no medical treatment is needed)." [Doc. No. 19, Exh. 7 Baldwin Aff., ¶ 9, Appendix A]. The drug screens are typically performed at Occumed.

Tims admits that Hopkins gave him this direction. Tims also admits that he was aware at the time that employees who are involved in accidents must be taken for drug tests. However,

4

while en route to Occumed, Hunter allegedly told Tims he could not be forced to go to Occumed because he quit. No other City employee has refused to take a drug test following an accident, nor has any other employee allegedly quit on the way to the drug test. Without informing Hopkins of his intent, Tims took Hunter home. He returned to the accident scene and then informed Hopkins, who was present, that Hunter did not want to take the drug test, and he had taken Hunter home. Hopkins informed Tims that he should have called Hopkins and that Hunter should have been taken to clock out if he refused the drug test.

On Monday, April 25, 2016, at Hopkins' direction, Tims called Hunter and asked him to take a drug test. Hunter then took a drug test at Occumed. The drug screen was positive for cocaine. Hunter either resigned on that date, or the City discharged him because of the positive drug screen.[3]

On the same day, April 25, 2016, Hopkins discussed Tims' conduct with his supervisor, Public Works Director Tom Janway ("Janway"). Hopkins testified that he did not intend to take any action against Tims. [Doc. No. 26, Exh. 4, Hopkins Depo., pp. 11-12]. However, according to Hopkins, Janway disagreed and said that he believed Tims should be suspended or terminated. Hopkins called Tims to his office and instructed him to go home until a disciplinary hearing could be set.

The City then applied the six-step procedure for discipline and termination decisions. At steps 1 and 2, there is an investigation and preparation of a pre-disciplinary hearing letter. At step 3 and prior to the issuance of the pre-disciplinary hearing letter, all supporting documents

---

[3] It is unnecessary for the Court to resolve Hunter's date of resignation or discharge for purposes of this motion, nor must the Court address the City's contention that Hunter could not orally resign.

5

were reviewed by Human Resources and approved by the City Attorney's Office.

On April 27, 2016, Tims was issued a pre-disciplinary hearing letter signed by Hopkins and outlining the events of the Hunter incident, although Hopkins testified that Janway prepared the contents of the letter, not him. Tims was further informed in the letter that a hearing to determine his discipline, up to and including termination, had been set for May 2, 2016, which is step 4 of the procedure.

A disciplinary hearing was held on May 2, 2016. Tims' employment was terminated on May 4, 2016, for insubordination. Although insubordination is listed as a dischargeable offense in the employee handbook, Mayo, Hopkins, Janway, and Assistant City Attorney Angie Baldwin ("Baldwin") all testified that there is discretion based on the facts of each case.

The City contends that Hopkins prepared the determination letter for Tims, consistent with the requirements at step 5 of the procedure. However, Baldwin actually prepared the letter and emailed it to Hopkins for his review. Hopkins discussed the insubordination determination with Baldwin and signed it, but he did not prepare the letter. At step 6 of the procedure, a draft of the letter was to be provided to the City Attorney's Office and to Human Resources, but Baldwin had prepared the letter herself. The letter was then forwarded to Mayo for his review. At some point Mayo discussed Tim's termination with Janway. The May 4, 2016 determination letter issued from Hopkins, notifying Tims of the termination of his employment and listed the events which lead "up to the decision to termination[.]" [Doc. No. 19, Exh. 18, Bates Nos. 00061-63]. However, Hopkins, who is now retired, denies that he thought Tims should be terminated.

On the same day, May 4, 2016, Hunter provided a notarized statement that Tims

attempted to take him to Occumed, but he insisted that Tims take him to his car because he quit. [4]

After the termination of his employment, on May 9, 2016, Tims initiated the City's three-step grievance procedure. At the first step, Hopkins addressed his grievance in a May 10, 2016 letter [Doc. No. 19, Exh. 19, Bates Nos. 65-66]. He found that Tims' "actions and/or inactions on the event date of April 22, 2016 warranted [his] termination. Therefore, [his] grievance request to be reinstated is denied. We will uphold the termination of employment decision." *Id.* at Bates No. 00066. Hopkins later testified that he did not have the authority to overturn Tims' termination of employment.

Tims pursued the second step of the grievance process, an appeal to Janway. [Doc. No. 19, Exh. 19, Bates Nos. 00067-00071]. A grievance hearing was held on May 19, 2016. Following the hearing, Janway denied the Step II grievance on May 20, 2016, explaining that "no additional information was provided" and he found "no reason to reverse the decision provided by . . . Hopkins." [Doc. No. 19, Exh. 19, Bates No. 00069].

Finally, Tims pursued the third step of the grievance process, an appeal to Mayo (who is Janway's direct supervisor). Mayo denied the Step III grievance on May 31, 2016, explaining as follows:

> Mr. Tims, at the time of your termination you were a supervisor who was given a direct order by your Division Head. The direct order was given after a serious accident involving someone under your control. Instead of following the order you took it upon yourself to disobey that order. You further admitted you did not even call your Division Head to ask him about your decision. Therefore, I find no reason to overturn your termination.

[Doc. No. 19, Exh. 19, Bates No. 00071].

---

[4] Tims took him home instead because he was concerned about Hunter driving when he was upset or shaky.

Prior to Tims' termination of employment, Janway did not recall any other supervisors who had been discharged for insubordination. Other than Tims, no other Union Executive Board Members were disciplined in 2016.

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.

Thus, Summary Judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248(1986)).

**B.     First Amendment Claims under 42 U.S.C. § 1983**

Tims contends that his employment was terminated in retaliation of the exercise of his First Amendment rights. He has brought his claims pursuant to 42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights." *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003). "To state a claim under 1983, a plaintiff must allege a violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted). A "person" under § 1983 may include a government entity if liability is premised on a policy or custom that caused the alleged constitutional deprivations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Board of Cnty. Comm'nrs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 483 n. 10 (5th Cir. 2000). An official capacity suit against an official is the equivalent of a suit against the entity of which the official is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985); *Brandon v. Holt*, 469 U.S. 464, 471-472 (1985); *Hafer v. Melo*, 112 S.Ct. 358, 361 (1991); *McMillian v. Monroe Cnty., Ala.,* 520 U.S. 781, 784-85, (1997)[5]; *Burge v. St. Tammany Parish,* 187 F.3d 452,

---

[5]As the Supreme Court explained,

a suit against a governmental officer "in his official capacity" is the same as a suit "'against [the] entity of which [the] officer is an agent,'" *Kentucky. . .* , 473 U.S. . . . [at] 165 . . . (quoting *Monell v. New York City Dept. of Social Servs.*, 436 U.S.

9

466 (5th Cir. 1999).

In this case, Tims contends that Defendants, acting under color of state law, violated his rights under the First Amendment. The First Amendment provides Tims a right to freedom of speech and freedom of association. Tims raises two bases for his First Amendment claim: (1) his support of Mayo's political opponent for mayor, Ray Armstrong, and (2) his union activities. The Court will consider each of these claims.

A "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140, (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). However, a governmental entity's "interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Id.* (quoting Pickering, 391 U.S. at 568). A plaintiff who asserts a First Amendment free-speech retaliation claim in the employment context must establish four elements: "(1) [he] suffered an adverse employment decision, (2) [his] speech involved a matter of public concern, (3) [his] interest in speaking outweighed the governmental defendant's interest in promoting efficiency,[6]

---

       658, 690, n. 55 . . .(1978) and that victory in such an "official-capacity" suit
       "imposes liability on the entity that [the officer] represents," *Brandon* . . . *,* 469
       U.S. . . . [at] 471 . . . .

*McMillian,* 520 U.S. at 785 n. 2.

    [6]"[T]here can be no question that . . . associating with political organizations and campaigning for a political candidate . . . relate[] to a matter of public concern." *Vojvodich v Lopez*, 48 F.3d 879, 885 (5th Cir. 1995); *see also Aucoin v. Haney*, 306 F.3d 268, 274 (5th Cir.2002) ("There is no doubt that campaigning for a political candidate relates to a matter of public concern."). Nevertheless, "[e]ven if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged. Courts balance the First Amendment interest of the employee against 'the interest of the State, as an employer, in

and (4) the protected speech motivated the defendant's conduct." *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir.2004) (en banc) (citing *Lukan v. N. Forest ISD*, 183 F.3d 342, 346 (5th Cir. 1999)). "If the plaintiff carries this burden, then the defendant must show, by a preponderance of the evidence, that it would have taken the same action against the plaintiff even in the absence of the protected conduct." *Lukan*, 183 F.3d at 346 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–87 (1977); *Brady v. Houston Indep. Sch. Dist.*, 113 F.3d 1419, 1423 (5th Cir.1997)); *see also Click v. Copeland*, 970 F.2d 106, 113 (5th Cir. 1992) (citing *Mt. Healthy*, 429 U.S. 274 ). Finally a plaintiff can rebut the defendant's showing with evidence that its "ostensible explanation for the discharge is merely pretextual." *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991); *see also Click v. Copeland*, 970 F.2d 106, 113 (5th Cir.1992).

The elements of public concern and balancing are legal issues for the Court to resolve. *See Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir.2001) (citing *Connick*, 461 U.S. at 147–48 n. 7). However, it is typically a jury question whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment decision. *Id.*

In this case, Defendants argue that Tims has failed to present sufficient evidence on the fourth element of his prima facie case–whether his protected speech or political affiliation motivated his termination.[7] Even if Tims could establish a prima facie case, Defendants argue

---

promoting the efficiency of the public services it performs through its employees.'" *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386 (2011) (quoting *Pickering*, 391 U.S. at 568).

[7]Defendants cite a slightly different test set forth in *Garcia v. Reeves Cty., Tex.,* 32 F.3d 200 (5th Cir. 1994). In that case, employees who had worked for the prior sheriff were terminated for their affiliation with him by the newly elected sheriff. In this case, Tims was engaged in the exercise of free speech by campaigning for Armstrong and wearing clothing with his name on it. The Court has cited to the proper test for a free speech challenge in the

further that they have presented a legitimate, non-retaliatory reason for his termination. However, a review of the facts show that Tims has raised genuine issues of material fact for trial.

First, "[c]lose timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a prima facie case of retaliation." *Mooney v. Lafayette Cty. Sch. Dist.*, 538 Fed. App'x 447, 454 (5th Cir. 2013) (citing *Evans v. City of Hous.*, 246 F.3d 344, 354 (5th Cir. 2001). In this case, both the timing and circumstantial evidence, when viewed in the light most favorable to Tims, are sufficient to support his *prima facie* case. Tims had no disciplinary history with the City between his hiring in 2013 and 2016. However, within a short time period after Tims was present at the candidates' forum in late fall 2015 and was allegedly pointed out by Mayo, he was disciplined twice and then terminated. His termination took place the month after Mayo was re-elected. This "chronology of events" is sufficient for "retaliation" to be plausibly inferred. *Mooney*, 538 Fed. App'x at 454 (citing *Brady v. Hous. Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997)). Thus, the evidence is sufficient, at this stage of the litigation, for Tims to meet his showing that his First Amendment activities in support of Armstrong were at least a "*motivating factor*" in his termination. *Mooney*, 538 Fed. App'x at 455.

Once Tims meets his *prima facie* burden, however, Defendants may still prevail if they show by a preponderance of the evidence, that it would have taken the same adverse employment action against the employee even in the absence of the employee's protected conduct. *Id*. at 455. Defendants present undisputed evidence that Tims was involved in an incident on April 22 2016,

---

employment context under the factual circumstances in this case. However, the focus under either test is on the motivation or reason behind Defendants' termination of Tims' employment.

in which he failed to take an employee for a drug test after being directed to do so by his supervisor. Defendants characterize his conduct as insubordination and offer evidence that Tims' employment was terminated for this reason, not his support of Armstrong. They argue that, regardless of his campaigning for Armstrong, he would have been subjected to same employment action. It is undisputed, of course, that insubordination can be a legitimate reason for termination, but, in this case, Tims has raised genuine issues of material fact for trial whether his actions in the April 22, 2016 incident actually motivated his termination. In addition to the temporal proximity between the Tims' First Amendment activities and the termination of his employment, Tims points to the testimony of Hopkins, his former supervisor who is now retired. Hopkins is clear that he had no intent to discipline Tims for the failure to take Hunter for a drug test based on the circumstances. It was only after he spoke with Janway that a pre-disciplinary hearing was arranged. Further, Defendants rely heavily on the involvement on Baldwin, the Assistant City Attorney, in the hearing to show that Tims received a fair hearing. However, according to Hopkins, no hearing would have been held at all except for Janway's directive. Janway and Mayo also admit to discussing Tims' campaign activities prior to his termination. Finally, the Court cannot disregard Janway's admission that he did not recall any other supervisor who was terminated for insubordination in the past thirteen years.

At trial, Defendants can certainly challenge Tims' version of events, point to Hopkins' inconsistent actions and statements prior to his retirement, and offer the testimony of Baldwin, Janway, and Mayo. However, these determinations are all based on the credibility of the witnesses and the relative weight of the evidence. Those types of determinations are the province of the jury, not the Court in ruling on a motion for summary judgment. Accordingly, the Court

cannot find that Defendants have met their burden as a matter of law to show that they would have terminated Tims' employment in the absence of his First Amendment activities.[8] Therefore, Defendants' Motion for Summary Judgment on Tims' First Amendment claim based on his political activities is DENIED.

2. **Union Activities**

Tims also contends that his First Amendment rights were violated when Defendants terminated his employment because of his union activities.

With regard to freedom of association, "[t]o prevail on a First Amendment retaliation claim, [a] Plaintiff[] must show (1) that [he] suffered an adverse employment action; (2) that [his] interest in associating outweighed Defendants' interest in efficiency; and (3) that Plaintiff[']s association with the union was a substantial or motivating factor in the adverse employment action." *Lawson v. City of Monroe*, 579 Fed. App'x. 305, 310 (citing *Hitt v. Connell*, 301 F.3d 240, 246 (5th Cir. 2002)). If the plaintiff meets his *prima facie* burden, then under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), "the burden then shifts to the employer . . . . to show, by a preponderance of the evidence, a legitimate reason for which it would have taken the same action against the employee even in the absence of this protected conduct." *Click v. Copeland*, 970 F.2d 106, 113 (5th Cir. 1992). Finally, the employee "can then refute this assertion by showing that the employer's proffered explanation is merely pretextual." *Id.*

Applying the guiding principles, Tims cannot establish a *prima facie* case. While he was

---

[8]Alternatively, even if Defendants' evidence were sufficient to meet their burden, the evidence presented is sufficient to raise a genuine issue of material fact for trial whether the proffered reason was pretextual.

14

subjected to an adverse employment action, Tims has failed to produce sufficient evidence that his association with the Union was a substantial or motivating factor in the adverse employment action. The evidence shows that Tims joined the Union shortly after he became employed with the City and became a member of the Executive Board. He continued to engage in Union activities for two years before the termination of his employment. Further, he admits that neither Mayo nor any other City official ever told him not to join the Union, not to attend Union meetings, not to make statements in Union meetings, not to participate in Union activities, or to quit the Union.

Tims relies on two instances of alleged Union animus to support his claim. First, he gives his own recitation of a supposed statement from his neighbor, King Dawson,[9] that Mayo was upset that Tims joined the Union. Tims did not offer Dawson's affidavit or declaration,[10] when exactly or in what context Mayo made any type of statement, or even whether Dawson actually quoted Mayo or gave his own general impression or paraphrase of Mayo's alleged statement. Finally, whatever Mayo's alleged statement, if any, a statement made in 2014 lacks

---

[9]Inexplicably, King Dawson's name is changed in some filings to Kenya Dawson. Mr. Dawson is active in local politics, so the Court will use the name Tims used in his deposition and which the Court believes to be correct.

[10]While Mayo's alleged statement to Dawson is an admission and thus non-hearsay, see Fed. R. Evid. 801(d), Tims' recitation of Dawson's statement is clear hearsay. Nevertheless, the Court has considered whether Dawson's statement could raise a genuine issue of material fact because Dawson could be presented at trial to testify about Mayo's alleged statement. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses.") *c.f. Vance v. N. Panola Sch. Dist.*, 189 F.3d 470 (5th Cir. 1999) ("While it is true that the evidence need not be presented in a *form* admissible at trial, this court does not allow the admission of pure hearsay or speculation as evidence to avoid summary judgment.").

temporal proximity to Tims' termination in 2016. Such evidence is too speculative to create a genuine issue of material fact on the third prong of Tims' prima facie case.

Tims also contends that he has produced evidence of Defendants' anti-Union animus because he and other Union officers received a written warning for attending the assault trial another Union officer. However, Tims was not prevented from attending the trial; he and other officers were issued written warnings for doing so on City time. There is no evidence that they would have been disciplined had they properly obtained permission to take time off and clocked out. Tims contends that this was Union "business," while the City considered the time to be personal since none of the employees were subpoenaed or required to be present at trial. In hindsight Tims believes the discipline was based on anti-Union animus, but he did not file a grievance or otherwise contest the discipline. Such evidence is again speculative and insufficient to raise a genuine issue of material fact for trial that Tims' Union activities were a substantial motivating factor in his termination.

Further, even if the Court were to find that Tims met his *prima facie* case, Defendants have offered a legitimate, non-discriminatory reason for his termination, insubordination, and the evidence of alleged anti-Union animus is also insufficient to show this reason was pretextual. Accordingly, the City's Motion for Summary Judgment on Tims' First Amendment claim based on his Union activities is GRANTED.

### C. State Law Claim

Finally, Tims asserts a state law equal protection claim pursuant to LA. CONST., ART. I, § 3, which provides in pertinent part:

> No person shall be denied the equal protection of the laws. . . No law shall

16

arbitrarily, capriciously, or unreasonably discriminate against a person because of political ideas or affiliations.

"Generally, the guarantee of equal protection requires that state laws affect alike all persons and interests similarly situated." *State v. Petrovich*, 396 So.2d 1318, 1322 (La.1981). "Section 3 commands the courts to decline enforcement of a legislative classification of individuals when the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, unless the state or other advocate of the classification shows that the classification has a reasonable basis." *Tomas v. Conco Food Distributors*, 97-426 (La. App. 3 Cir. 10/22/97), 702 So. 2d 944, 948 (citation omitted). Therefore, a plaintiff asserting that he has suffered a violation of his Equal Protection rights must show that Defendants were "administering any state law when it terminated his employment." *Millon v. Johnston*, No. CIV. A. 98-2235, 1999 WL 104413, at *6 (E.D. La. Feb. 19, 1999).

In his opposition memorandum, Tims argues that he can meet his required showing because the City relied on Ordinance No. 10,056 in terminating his employment. As a member of the Union, Tims was employed under the provisions of the CBA between the City and the Union, which the City had approved under Ordinance No. 10,056. Under Section 3 of the CBA, the City has the right to "suspend, demote, discharge, or take disciplinary action against any employee for cause" without negotiating with the Union. Tims contends that he has raised a genuine issue of material fact for trial whether he was discharged because of political affiliations, and, therefore, Defendants' application of "for cause" provision of the CBA was improper and a violation of his Equal Protection rights under state law.

The Court disagrees. Tims has cited no case in which the state equal protection law has

17

been applied in this way, and the case upon which he does rely is inapposite. In *Louisiana Associated General Contractors, Inc. v. New Orleans Aviation Bd.*, 99-0025 (La 7/7/99); 764 So.2d 31, the Louisiana Associated General Contractors ("LAGC") filed a Petition for Declaratory and Injunctive Relief against the New Orleans Aviation Board ("NOAB") alleging, among other claims, that the NOAB program for "disadvantaged" business enterprises created unlawful race- and gender-based classifications in violation of Article I, § 3. On review, the Louisiana Supreme Court considered whether the program' [was] unconstitutional, as opposed to a 'law or ordinance.'" *Id.* at 33. Ultimately, the Louisiana Supreme Court did not reach the constitutionality of the program, holding only that the program violated a City ordinance.

In this case, Tims seeks to stretch the equal protection provisions of state law to apply to an employment dispute. If the Court were to accept his argument, then every time a public employee challenged his termination under the for-cause provision of a CBA, his breach of contract claim would be converted into one of constitutional dimensions as long he could point to some protected characteristic. The Court does not believe that this is the type of administration of state law that the equal protection clause was intended to address. Accordingly, Defendants' Motion for Summary Judgment on Tims' state constitutional law claim is GRANTED.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 19] is GRANTED IN PART and DENIED IN PART. To the extent that Defendants move for summary judgment on Tims' First Amendment claim based on his union affiliation and his claim under LA. CONST., ART. I, § 3, the motion is GRANTED, and these claims are DISMISSED WITH PREJUDICE. The motion is otherwise DENIED.

18

**MONROE, LOUISIANA**, this 26th day of March, 2018.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE